Good morning. We have one case on today's calendar, an important case, Hovey v. Woodford, and we will call that case. Mr. Court, I'm William McNair, representing the appellant Richard Hovey, and I'd like to reserve five minutes for rebuttal, if I may. Mr. Hovey admitted that he kidnapped and inflicted the injuries that killed Tina Salazar, and the only issue at the guilt trial was premeditation, whether the killing was premeditated, and that hinged entirely on the credibility of the two jailhouse snitches, one of whom didn't even appear for trial. The prosecution was able to prop up their credibility and get a premeditation verdict, and therefore a death penalty, by violating Griffin v. California, by commenting directly on Mr. Hovey's failure to take the stand and contradict the testimony of the jailhouse snitches. Indeed, at one point in the argument, he pointed at Mr. Hovey when he said, he's never told you anything different from what the snitches had testified to. That's a sort of a grace note. Is that in the record? May the record reflect what he's pointing at? Yes. Indicating the defendant is what it says. The prosecution also violated Brady v. Maryland by failing to disclose the inducements that were offered to the snitches to testify, and the prosecutor affirmatively elicited their testimony that they had received no promises, which I would submit is fundamentally dishonest. How would you characterize what it was that they understood? That they understood? Yes. That they were, well, it was a little different for each of them. Hughes, which wasn't his real name, but that's the name that he used at trial, clearly had an understanding that even though he was facing four felony charges in two different counties, he was not going to prison. He was going to walk out the front door, and in fact, he did. Judge Patel said the fact that he got a favorable treatment after he testified was not evidence that he had no understanding at the time he testified. It certainly was evidence. Flesh that out. Had an understanding as a kind of a broad abstraction. Did somebody tell him before he testified in return for your testimony, or some equivalent to this, we're promising you that you will walk on four felonies? Tell us exactly, factually what the record says on that. The, no. The short answer is no, they didn't say, we promise you that you'll walk, but as Judge Patel said, it's in our grief. At page 55, there's quite a good summary of the findings made by Judge Patel about the relationship between Hughes and the various agents of the prosecution, including Melloling, who was the counsel at trial. But that wasn't the only way that the prosecution was able to get a premeditation verdict, because Mr. Hovey's trial counsel, Paul Trudell, failed in a couple of significant respects. You know, to me, the informant thing is a very important part of the case, and I want to make sure I absolutely understand precisely what it was that you say is the Brady violation. So that's why I want to know, you say page 55 captures, and Judge Patel captures exactly what was in Hughes' mind, and who put it there? Well, this was not the subject of your brief, is that what you're talking about? I'm sorry? You're talking about page 55 of your brief? Yes. Yeah. So that's page 55, which cites Judge Patel's findings. Judge Patel granted summary judgment on this issue without conducting an evidentiary hearing, and yet there's the testimony of Hughes on deposition, the testimony of Lee on deposition, both of which were videotaped. She didn't bother to look at and didn't hear their testimony, or the testimony of any of the prosecution agents who dealt with these guys. She granted summary judgment without drawing all the reasonable inferences, including the fact that they got favorable treatment in favor of Mr. Hovey. What was, in fact, the impression that the jury was left with at trial with respect particularly to Hughes? I'm sorry? What is the difference between what the jury heard at trial with regard to the promises made to Hughes, and what you think could have been surmised from the ultimate record? On the Brady issue? Well, on the Brady issue, but also – yes, okay, on the Brady issue, go ahead. Because the other part, the other side of that, is the impeachment information that Trudell failed to get, or failed to use, which was – Which would have been available, but he didn't use it. Which – Which would have been available, which wasn't withheld, but which he didn't use. That's right. On the Brady issue, well, that Hughes was offered – made to understand that he would not have to go to prison, that Lee would get out of San Quentin. They failed to disclose the letter from the deputy district attorney to the Department of Corrections. What I'm asking is this. The jury was certainly – there was cross-examination with regard to what Hughes expected to get from his testimony, and the jury was – he said there were no promises, but he essentially said, but I expect to be treated well, and that's sort of the short version. And the question is, what is the difference between what he said and what he could have been cross-examined with, in a way that was prejudicial to the jury? I think the details would have been very revealing. Didn't Melloling go over to San Francisco to see you facing the charges? There was no mention of the San Francisco charges at all, that he was facing two felonies in San Francisco. There was no mention of the fact that when he violated probation, he came back and instead of being locked up, he walked out the front door. And this was all part of the pattern of – it was basically a wink. No promise. Was there enough there for the jury to infer, based on the proceedings in the trial, that they had been offered something in return for their testimony? Well, I think that would have been a big inference for the jury to draw, based on what was before them. There certainly would have been enough for the jury to infer that they were offered significant consideration had the Brady material been disclosed, had Trudell used the information in his files about these informants that he didn't use. He both didn't investigate it, didn't talk to him, and didn't use the information that he did have. That would have certainly impaired their credibility. Well, what was Judge Trudell's bottom line on this? Was it essentially that the jury did have reason to know and would have thought that these people were testifying because they expected a quid pro quo in the long run? And so it was the difference between a sort of encoded expectation of a quid pro quo and a promise of a quid pro quo. That's basically what she said, that that wasn't sufficiently prejudicial. It really didn't approach – the jury couldn't have understood that there was a quid pro quo. These – Is that what Judge Patel said? Judge Patel? Yes. In other words, what was her ultimate conclusion with regard to both the Brady and the NAPU and also the – On Brady, she said that the information wasn't material in the sense that it wouldn't have affected the outcome. Is that right? Sorry? Essentially for the reason that I've described? Yes. All right. So the question is, why is that wrong? Well, that's wrong because on summary judgment, she has to draw all the inferences in our favor of the state, and she decides that the jury could not possibly, if they had been given this additional information, have drawn the inference that these were not disinterested observers, good citizens who just wanted to come forward. These were people who had an interest because the prosecution was dangling offers in front of them, which they delivered on. And the jury never knew that the prosecution had delivered the benefits to these two informants, that Lee gets out of San Quentin and that Hughes doesn't have to go to prison. Had they entirely delivered by then? Isn't that part of the problem, that some of the sentences haven't even happened by time of trial? The second Colby sentence, am I wrong about that? I mean, Hughes, I'm sorry. Well, with Lee, he didn't testify at trial. He was gone, and he had been let out of San Quentin, and that was fully available to the jury. Hughes had all of these interactions with the prosecution and had violated probation and had been released, and so that had all happened before he testified. It's true that right after he testified, he was taken back to San Francisco. They revised the plea. So some of it had happened and some of it hadn't happened. That's right. Did Hughes himself give a reason for testifying? Was he the one who said something to the equivalent of, I just wanted to unburden myself of this awful thing? I think that was Lee. That was Lee. I think that was Lee. At least one of them said something to that. What impression did the prosecutors leave on direct examination? Did they ask questions like, has anybody made any promises to you in return for your testimony? That's exactly what they did, right at the climax of the direct examination. And the answers were negative. And given what the prosecution had done, I suggest that's fundamentally dishonest. The other thing that Trudell didn't do in the guilt phase that affects the credibility of the informants and the jury's willingness to credit the snitch's testimony was he conceded in his closing argument that there was sufficient evidence of premeditation to support a first-degree verdict. Well, the only evidence of premeditation came from the two snitches themselves. Well, the other side's going to argue that there's scientific evidence that knives were used, that a knife was used. Or just the circumstances of the crime. Right. Well, the circumstances of the crime certainly showed that he intended to kidnap the girl. But there's a big difference between premeditating the killing as opposed to planning a kidnapping. The knife, the cause of death, according to the medical experts, the prosecution experts, was blunt trauma. And the prosecution's witnesses saw, we'll say Mr. Hovey, they didn't know who it was, beating the girl with some object. And the knife came from the testimony. Was there any testimony from a coroner or somebody like that, that there was a knife that was involved in inflicting the injuries? There was no coroner testimony. One of the prosecution medical experts said that it could have been a knife. Could have been a knife. I thought they basically all said it could have been. All medical people said it could have been because of the knife. Not all of them, no. And the defense experts said it couldn't have been. The radiologists who looked at the wounds and so on. But still, the net result was that nobody said it was. None of the medical people said it was a knife. Is that right? Right. And no weapon was ever located. There was some suggestion that it might have been a shock absorber that was found in the car, picked up. And none of the medical people definitively said it was a knife. That's right. None of the medical people definitively said it was a knife. That's right, for sure. Then Trudell concedes that there's sufficient evidence of premeditation, which the prosecution couldn't even charge Mr. Hovey with this crime until they had the statements from the two snitches. They didn't even have enough evidence to charge him with the crime, much less prove premeditation absent the testimony of these two snitches. Now, it was counsel's unpreparedness to deal with the snitch's testimony, Lee in particular, that led the trial judge to do an amazing thing, something I hadn't heard of in any other case. She interrupted the trial right in the middle of the guilt phase and conducted an evidentiary hearing on counsel's competence and took testimony, had witnesses come in and testify about his competence and experience and so on. And unfortunately, Mr. Hovey was not allowed to attend that hearing. Judge Patel decided that that was error, that that violated the defendant's right to be present at all significant trial proceedings and decided that the error was harmless. Her reasoning was that unless there was ineffective assistance of counsel at trial, prejudicial under Strickland, there was no harm in excluding Hovey from this proceeding. That's the wrong standard. That would permit excluding the defendant from an entire trial unless he could prove Strickland prejudice because of ineffective assistance of counsel. And when you think about it, Strickland requires deference to trial counsel, sort of a presumption that the trial lawyer behaved reasonably. What if the standards were, what if, she certainly said what you said she said, but suppose instead she said that what matters is not whether there was Strickland prejudice but whether there was Strickland ineffectiveness without prejudice. If you throw the prejudice piece in, then you're completely undermining any, you're basically saying there can't be structural error here. So to make a test for structural error, whether there was prejudice, is just to eliminate the possibility of structural error. But suppose you were to say that we need, in order to know whether this is structural error, i.e., pervaded the truth by any part of the trial, we at least have to know whether he was ever ineffective. Would that make sense as a standard? Well, Campbell v. Rice, this Court's decision, holds that a proceeding just like this one, but without witnesses, plus structural error. Yes, but the big difference there, as I believe, was that there was a piece of critical information that the defendant never got by not being there, i.e., that his lawyer was inflected. Whereas here, whatever she was inquiring into, the information she was inquiring into, at least as to whether he was representing Hovey properly, Hovey already knew or could know and had the ability to come forward if he wanted to. So it wasn't, in terms of the immediate effect of the exclusion, i.e., keeping this critical piece of information from him, it wasn't really the same. Well, Hovey had already, at the beginning of the trial, asked for appointment of different and separate counsel. And the trial judge made no inquiry at that point. She brushed him off, said, no, you're in good hands. I've got a couple of good lawyers here. He didn't inquire into the source of his dissatisfaction at all. He didn't exactly say he didn't want him. He said he wanted somebody else, too. Well, he was not allowed. The only point I was really making was only that it isn't exactly the same as Campbell, because the presence there would have given him a critical piece of information that he didn't have. That the conflict existed with that lawyer, I agree with that. But on the other hand, Hovey could have pointed out to the judge, in his case, that there was an additional conflict that Trudell had, that both of the snitches who had been his roommates were represented by the public defender's office. And now they're coming in. Did Hoffman know that? Hovey knew that from being with him in the cell. He didn't say that in his declaration that he submitted it. He did not say that in his declaration. I don't think it's in the record that he knew that. Well, it is in the record. It's not in his declaration. Not in his declaration before the district court. The, you know, Strickland, with its requirement of showing deference and presumption of reasonableness and so on, the whole deference thing has nothing to do with the presence there. By the way, did that information on the conflict ever come out of trial? Did the judge know it? Did the judge know? About the conflict? Or about the prior activity? Nothing to indicate that she knew that. Ever? Ever. One might have guessed, but it would only be a guess. I don't think there was anything to show that she knew that. So what's your position? Do you contend that it's a structural error? Yes. Under Campbell v. Bryce, it certainly is. But even if it's not, certainly there's prejudice to Hovey. The trial judge made findings that from this hearing, that Hovey was excluded from, that Trudell was competent and refused to provide any substitute counsel. And then Judge Patel finds that Trudell, during the course of the trial, did a number of things that were deficient, unprofessional in representing Hovey. She goes on to find that none of those was prejudicial, but he certainly was prejudiced in a real sense by Trudell's conduct of the defense. And that ought to be enough. That ought to be enough to show what? The purposes of the presence there? Ought to be enough to show that, to demonstrate that the presence error, there's sufficient prejudice there for holding that the right to be present was violated and was present. What ought to be enough? The fact that he was, in fact, ineffective even if it wasn't prejudicial? Or what? What ought to be enough? I'm sorry, I can't hear you. What ought to be enough? That Trudell misbehaved. That he did a number of things that were objectively unreasonable. Whether or not they were prejudicial. Exactly. Because the whole deference thing has no role to play with regard to presence error. Or with regard to determining whether prejudice there is structural error. Now, you think presence error is always structural error, or you think that as long as it had some actual impact on what happened, even if you can't prove it to be prejudicial? The latter. And I'm aware of the court's read-back cases where they say that the court has said that's not structural error. But that's where the defendant is represented by conflict-free counsel at the proceeding that the defendant doesn't get to attend, which is not true here. And then Judge Patel goes on and holds this is not a critical stage of the proceedings, and therefore Hovey wasn't enticing counsel at all at this hearing. And that's wrong. A critical stage under Bell v. Cohn in the Supreme Court case is simply a step in the proceedings that holds significant consequences for the accused. Here the question at the hearing is who's going to be representing him, and is he competent? Those are certainly significant consequences for the accused. So on the... Well, you're right when you said it was kind of an amazing proceeding, but my sense of that was that if she knew that if she had brought Hovey in and raised all these concerns in front of Hovey, there was a substantial likelihood that she would have to declare a mistrial. She may have known that. She didn't say that. No, but that concern is replete throughout those proceedings. The other thing was that the judge's concern, at least at the outset, wasn't really that he was being ineffective. It was really that he was being duplicitous about being ineffective. He was trying to appear ineffective when he wasn't ineffective. That was really what she was saying. And so her, at least Judge Taper's original view of the matter, was that this really wasn't a problem for Hovey because it wasn't that he was being ineffective. It's that his strategy was to appear ineffective. Yeah. Well, that was her semi. Building error into the record. Well, you know, you look at the things that Trudell said and look at footnote 13 and we put in a couple of others, there's a good reason to think that he was building error into the record. I mean, it's hard to imagine. He assessed his case as extremely difficult. I mean, I guess it's his strategy. But he thought he had a very difficult case. After the fact, that's what he said. Well, I'm just kind of suggesting. I mean, his assessment that he had a difficult case is, you know, it's hard to. Well, he admitted that he underrated it at the time and that it was a learning experience for him. You haven't attacked the process itself of taking somebody into chambers and asking what's going on. I frankly think that was laudable. Judges ought to be protecting people's rights to counsel, especially in a death penalty case. Exactly. The problem is that you think at any time and every time that happens, the defendant must go in chambers. There isn't time to know what's going on. Well, the issue is his representation. Is that what you're saying? Are you saying, I mean, this was not just a little inquiry. It was a hearing with witnesses and so on. Yeah, it was not an informal. You know, Campbell was a pretty informal inquiry, the judge and a couple of lawyers, and said you've got a problem with this. This is where the judge conducts a hearing, puts the witnesses under oath, and has them testified. There's lots of, you know, interaction between counsel and the judges in a proceeding. This goes way beyond just a simple interaction. I think so. The other issue that I'd like to discuss in the brief time remaining. Look, we're not going to press you on time. This is a serious case. Ignore the clock. So long as you're talking about important things, we're going to let you go. All right. But I don't think it's practical for me to argue all of the issues. That's your choice. I just don't want you to feel pressed by the numbers. I'm quite prepared to answer the Court's questions on every issue, but I just want to address one other principal issue, which is the penalty phase issue of ineffective assistance, dealing with the presentation of the psychiatric mitigation case. Judge Patel found that Trudell had done a shoddy, binding her word, shoddy job and was deficient in several respects in presenting the psychiatric case, but found that that error, too, was harmless. She didn't have the benefit of the Supreme Court's decision last year in Wiggins v. Smith, which requires a court to reweigh the evidence in aggregation against the totality of the available mitigation evidence. In other words, look at the mitigation evidence that could have been presented. Judge Patel, of course, didn't do that because she didn't have the benefit of Wiggins. When was this case tried? The Hobey case was tried in the fall of 1981. What was the standard at that time? Because as time has gone on, it's become a de rigueur to find everything and anything that is in somebody's background and pile it in. It wasn't that way back in 1981. With respect, I beg to differ on that, and this Court has reversed cases from that very era. But that's not really the issue here anyway. This isn't a case in which the question is that they should have put on a certain kind of defense and mitigation. They did put on a defense and mitigation with respect to his mental health. The problem is that they did it with the psychiatrist not having certain information and therefore being cross-examined in a way that undermined his testimony. So it's not really like the other cases, it seems to me. Well, it's not like a case where there's no mitigation presented. But it's also not a case in which they didn't put on his background or they didn't put on a certain – it's not that we're arguing over what kind of mitigation evidence could have been put on. It was put on, but it was put on in a way that seems to severely undermine it. So it doesn't seem to me a situation which is involved on that issue. Well, but there were important omissions in the case, including that doctors long before the crime had found Hovie mentally ill and had prescribed – Well, not long, actually, pretty short, which is more important. Sorry? It really wasn't long. It was pretty short before the crime, like a year. Well, the rest of the day before the crime when he is taken to Chope Hospital in a catatonic state and they prescribed – That much Dr. Stanton knew, right? No. He was taken to Chope Hospital in a catatonic state. No, he was not given the Chope Hospital records. No, but he knew – he did testify to some material, knowing something about Chope Hospital, and I thought there was that much he knew. He knew that Hovie had been taken to Chope Hospital. Hovie had told him about that, that he had walked from San Francisco to SFO, broken into a car, and had been taken to jail and then to Chope Hospital. He knew that much. He didn't know that doctors had suspected schizophrenia and had prescribed serious antipsychotic medications so that when Stanton testifies, he's cross-examined, has any doctor ever treated him for mental illness? I don't know of any evidence of that. Has he ever been prescribed Medicaid? I don't know. Not that I know of. So the jury – And that was just wrong. False. That's inaccurate. The jury was given a false picture of what that background was, but that wasn't all. The psychiatrist then argues that in closing argument. I'm sorry? The psychiatrist – I mean, the prosecutor then argues that in closing argument as well. The prosecutor argues that if he's mentally ill, there's nothing he can do about it. Nobody's ever treated him. Nobody's ever prescribed any medication. Not true. And then there were the eight times he's taken to the hospital while he's in jail before trial, and the doctors at Fairmont prescribed an antipsychotic. But those records didn't Stanton have? Stanton had – exactly, Your Honor. Stanton had those records. And Trudell – this is not a question of psychiatric malpractice. It's ineffective assistance by counsel. Trudell didn't ask him a thing about those records. What did Trudell say about that in the evidentiary, Your Honor? There's nothing to indicate that he made any tactical decision. Because there certainly could have been one, which was that they had a different diagnosis. Different diagnosis, but their findings of his behavior – And, in fact, at Fairmont, the recommendation that he needed long-term treatment was inconsistent with any lesser, less serious diagnosis. The one thing that did strike me about the record was that no one, neither Dr. Chope nor the Fairmont doctors – Dr. Stanton nor the Fairmont doctors suggested that with medication he would – that he needed medication, and if he had medication, he would succeed in prison. There was no sort of evidence about why any of this exactly mattered to the future with regard to mitigation, right? Well, the future was cut off because Stanton was asked the wind-up question after all of the history, after all the interviews and what Stanton had done, the inquiries – wind up, is he mentally ill? And the prosecutor jumps up and says, at this time, yes. Objection, irrelevant, sustained, and then that was asked again. But I say that even now, even in the evidentiary hearing on the habeas, there is still no showing or indication that he could have or would have been treated with medication for the schizophrenia and therefore would have been otherwise. That's true. There's nothing on that subject. What was Trudell trying to show with his mitigation evidence? Well, who knows, Your Honor, but at one point he testified that what he wanted Stanton to do was not testify particularly about mental illness, but rather to present in the guise of – those are Trudell's words in his deposition – in the guise of psychiatric testimony to get Hovey's version of the offense, what happened before the jury, in a way that wouldn't subject Hovey to cross-examine. It's a sort of misuse of psychiatric testimony. That was one of his goals. But to the extent that he was doing what is professionally responsible, that is trying to find out was he mentally ill at the time of the crime, he did that. It's really undisputed that he was mentally ill at the time of the crime. Prosecution argued that he wasn't, but there was no prosecution psychiatrist. And then he was foreclosed by the trial judge's rulings from showing that he was mentally ill at the time of sentencing, the time the jury was deciding whether he'd live or die. That was excluded. That, under Payton and Belmonte's decision to this court, was error by itself, because the jury was foreclosed from giving full effect to mitigation evidence, that is, that he was mentally ill and sort of looking toward the future. Judge Patel said, you know, the instructions to the jury didn't say what of these factors is mitigating, which one's aggravating. Judge Patel said, well, a jury could decide that mental illness is aggravating, which would make some sense to some jurors because he's irrational, he's dangerous, we've got to put an end to this and hold his mental illness against him. And, in fact, the prosecutor- It's a factor for extreme mental illness, a separate factor, not a diminished capacity kind of factor, and they certainly could have plugged it into that. And in that respect, this sort of differs from Payton and Belmonte's, because there is a home for this evidence in the instructions. The same instructions were given in Payton and Belmonte. No, but in those cases, what they were trying to demonstrate wasn't simply mental illness. They were trying to demonstrate future behavior. I mean, that's why I was asking these questions before. They were trying to demonstrate that those people were going to be net positive people in the long run. You don't have that here, and you don't even have an indication that he was going to behave differently than he's behaved before because he's going to be medicated and treated. So I'm not sure you have anything other than what is already covered in the factors. Well, Trudell did call two witnesses, Department of Corrections and a jail witness, to testify that Hovey was just fine in custody, didn't cause any problems. Right, but that's not connected to the mental illness stuff. I'm saying with regard to the mental illness stuff, I'm not sure that the J factor really matters here. There was a factor into which this evidence fit. If they believed it and if they credited it, and they seem to be at least playing with it because they asked questions about it and so on. So I guess I'm saying I'm not sure that's your strongest argument. The question of how the psychiatrist was undermined seems to me is a problem or could be a problem, and that's what I'd like to hear more about. The portion of the instructions pointing the jury to extreme mental disturbance. It's actually testified to. He testified to a severe mental condition. That is what he testified to. If you believed him, if you believed Dr. Satton, wouldn't you believe that it was an extreme mental illness? Well, the problem was that his credibility was severely impaired by Trudell's failure to prepare and to protect him. He gets asked on cross-examination about some heavyweight tomes, some psychiatric tomes that Satton hadn't seen and hadn't relied on, and then asked, well, in your own reading, have you found that psychiatric diagnoses are right more than a third of the time? And he has nothing at hand. And what is that, prosecutorial misconduct? No, no. It's Trudell's failure to object to the obviously inadmissible question about materials that the expert had not relied on. And he sits on his hands, and then the prosecutor gets up in argument and says, these kinds of diagnoses are right no more than one out of three times, pulling the rug out for him, not telling Satton the most basic information about the crimes, not giving him the records, not telling him things that he needed to know to protect himself from cross-examination, which allowed the prosecutor to ridicule him in argument and the trial judge to discount his testimony to zero. Had the right kind of job been done, I'd suggest you could look at the excerpt of Record 288, which lays out what the psychiatric mitigation case could have been, and it's summarized in our reply brief at page 27 if Satton had been given everything that he needed in order to do the kind of job that this Court and others expect complement counsel to do. As I say, I'm willing to answer the Court's questions on every issue, but... Can we just go back to the guilt case for just one moment? Would you understand Hobie's overall strategy? Hobie's strategy? Fidel. Fidel's strategy for how he was going to defend. Well, you can't tell from reading the trial record what his strategy was, and you would scratch your head and wonder if he had one at all or whether he was playing by the feet of his pants. He claimed he did, at least. That his assessment was he couldn't get second-degree murder. That the jury wouldn't give it, in this case. They would insist on first-degree murder. He makes that determination without having investigated, as Judge Patel found, without having adequately investigated whether it was possible to impeach the two snitches. So, under Wiggins and a whole bunch of these cases, that tactical choice that he made is not entitled to deference. What he said was... Let's just go back for a minute. Is Wiggins a chief problem? Is Wiggins a... A chief problem. I mean, in other words, you're relying on Wiggins. No, no, no. Wiggins is just... It's just an application of existing law. Saying, here's how courts should approach Strickland analysis. Strickland... All right. Then go back to Judge Patel's question. I'm sorry. It's been the law for long enough. Well, Trudell says, so what I'll do is I'll try to fool everybody and get a first-degree felony murder verdict by letting the invalid special circumstances, lewd and lascivious act on a child, stay in the case. It was clearly invalid and the prosecutor conceded it was immediately when it was raised, finally. But he'll leave that in the case and he won't challenge the snitch's testimony that the girl was molested and he won't object to the district attorney arguing molestation and so on. And then he'll use that to say, well, now you find felony murder that he committed the killing in the course of a lewd and lascivious act on a child. But there was nothing to prevent the jury from doing exactly what they did. He prejudged the whole case from the beginning. I wanted to give an alternative, but I don't understand the details of it very well. Because he wasn't charged with lewd and lascivious behavior as an underlying charge, right? He was not. And he wasn't charged with felony murder based on it. That's right. He was only charged with a special circumstance based on it. That's right. So why is having that special circumstance in there or not having it in there have anything to do with whether or not he can get an instruction, a felony murder instruction on lewd and lascivious behavior? Because it wasn't true. The trial judge thought that without it, he could not, without that special circumstance being charged, that he was not entitled to a felony murder instruction. I mean, why would he be anymore with it? It's still not an underlying charge. But I also thought that the district attorney thought that because it was an underlying charge, it couldn't be a special circumstance, and that's why he agreed to dismiss it. It was an error. Not only because for evidential reasons it's not permissible, but it wasn't permissible for legal reasons. Well, because they hadn't alleged, and the reason they hadn't alleged is because they couldn't prove. They hadn't alleged the element. It just wasn't going. No matter what, that thing wasn't going. That's right. But there it was. The prosecution brought that charge knowing that they couldn't prove it. But couldn't all that evidence have come in anyway? I'm sorry? Couldn't all that evidence have come in anyway? Didn't the judge say that it would have all come in anyway? She said that casually. She said, oh, my goodness, I allowed that testimony to come in. It would have come in on motive. But she didn't make any ruling on that. But it was the motive that they argued from day one. The government's theory was that this was the motive, and why wouldn't it have come in? Well, it should certainly have been tested under 352 of the evidence code because it was highly prejudicial, and what did it prove? The prosecution's theory of premeditation was the girl had seen him and, therefore, could identify him. Well, they can go ahead and prove that without proving in addition that he molested her. So there was a good chance, properly briefed and argued, that, which Trudell, of course, never pursued at all, that their molestation testimony could have been redacted. It would have been real easy with Lee because he's not testifying live. They just read his testimony from the preliminary hearing. And with Hughes, it would have been easy enough to instruct the prosecutor what he could ask Hughes about that. Thanks very much. The judgment should be reversed. Counsel, we'll hear from you again when we hear from the other side. Good morning. May it please the Court, Morris Bates for the California Attorney General, on behalf of the respondent to this case. There have been a lot of issues raised, and at any time you want me to respond to specific issues discussed earlier, please do so. Well, all right. I'll take that invitation. I'm particularly concerned about the Gryphon error. Everybody seems to concede, maybe you don't, that there was Gryphon error. In other words, the prosecutor commented on Mr. Hovey's constitutional right to remain silent. Do you concede there was Gryphon error? I don't, Your Honor. We argue that it wasn't. We argue that the prosecutor was directing his comments to the stipulation that was presented to the jury at the beginning of the trial, where they conceded that Hovey abducted this little girl and that he killed her. Well, how can that be? Let me read you this testimony. Here is the closing argument. The prosecutor says, the killing of Tina Salazar. We don't have the weapon. You know, Mr. Hovey, Mr. Hovey told Mr. Lee and had told Mr. Hughes that he used a knife. He's never told you anything different. And then the record says, indicating the defendant. So what I see in my mind is a prosecutor saying, Hovey told Lee and Hughes that he used a knife, and then the prosecutor says, he never told you anything different. Now, I'm having a hard time, and you have an opportunity to tell me I'm wrong, seeing how that's a comment on a stipulation. It's the context of the stipulation, where the jury is dealing with somebody who has admitted to abducting an 8-year-old child from the street and killing her. The only question was, was there premeditation, deliberation, and connection with the abduction of a child by an adult? He conceded that. Now, what is it that the jury has to learn from the evidence that was presented and from the presentation and concessions made by the defendant? The issue is still premeditation and deliberation. What was there further to be determined by the jury? Now, this is a passing comment with respect to the presentation of this concession by the defendant. The district judge in reviewing this noted that it is a passing remark, that the argument is far more substantial than that, that the evidence of his abducting, killing, and killing this child with premeditation and deliberation in order to prevent her from identifying him as her molester does overwhelm it. What's the evidence? The evidence is that she snitches. Pardon? What other than that she snitches is the evidence? The evidence is that an adult abducted an 8-year-old child, little girl, from a street and killed her and then flung her body from his car where she died, and she died eight days later. Right. The inference, the motive, that any reasonable juror might likely find in this is a molestation. It's something abnormal. The purpose for which he killed her, the reason that he killed her... But the important error was, the important statement, at least one of them was, Mr. Hovey told Mr. Lee and told Mr. Hughes that he used a knife. He's never told you anything different, indicating defendant, i.e., he's never told you that he didn't use a knife. That isn't comment on the stipulation, because the stipulation wasn't about him using a knife. No, the stipulation was about the circumstances of the crime. And there was no, none of the doctors said it was a knife. They said it could have been a knife, but nobody said it was a knife. It could have been a knife. There were, I believe, 14 lacerations. Okay, but it could have been a screwdriver, it could have been something. Nobody said it was a knife. So who said it was a knife? Who said it was a knife? Mr. Lee and Mr. Hughes. The informants identified a knife as being the weapon used, and in connection with the concession that the defendant made, the stipulation that was presented with respect to how the child was abducted and killed, that was an issue that the prosecution presented to the jury. Now, to the extent that, again, it is a griffin error, the district court found it to be harmless in light of the overwhelming evidence for meditation and deliberation that enabled the jury to come back with a first-degree murder conviction. So the issue is, was there a griffin error? We don't believe there was in light of the stipulation. It was overwhelming evidence. There was some adequate evidence if you believed the two jail informers. So the real problem is whether the griffin comments, so since the jail informers were, to begin with, sort of suspected it was evidence in the record to indicate that they had motives, the real question is whether these griffin comments added to the shakiness or the fact that the informants could be disbelieved was sufficient to show prejudice. Well, again, it's a review of the record in its entirety. I'm sorry? It's a review of the record in its entirety. Right. So what is the record in its entirety? The record in its entirety shows an adult abducting a child, killing the child, and two informants, jailhouse informants. Is it important to the case whether or not they had a knife? Is it important? Whether or not Harvey had a knife. The prosecutor seems to think so. I don't think it was. I think being slaughtered by a- He certainly spent a lot of time trying to prove he had a knife. Pardon? He certainly spent a lot of time trying to prove he had a knife. Well, the knife indicates that he had an intent to kill the child before he took her off the street. Right. So there was a lot of energy put into proving that he had a knife. And the griffinary relates to whether he had a knife, and the question is whether on that question, which could have been a dispositive question, it's not. Well, the question was, I believe, resolved by the nature and circumstances of the crime itself. Whether it was done by a knife or whether it was done by some object in the car, I think does not make a difference to a reasonable jury in light of the fact that there were two jailhouse informants who did testify that he molested this child and that he killed her in a panic because of the molestation, because of abducting a child for the purpose of molestation, and that he flung her from the car. I thought killed her in a panic was his theory. Pardon? I thought killed her in a panic was his theory. Well, what was the panic? He panicked because she would identify him as her molester. That's called premeditation and deliberation under any standard in any jurisdiction I'm aware of. Did he stipulate the premeditation and deliberation? No, he did not, Your Honor. And the knife issue related to premeditation and deliberation. It did, Your Honor. You see, I go back again, and I'm going to give you every opportunity you have to convince me that this wasn't griffinary, but look at this again. If it was griffinary, Your Honor, it was harmless. The district court believed so. The record reflects that. The record supports that. I think there was no way. I think it was griffinary because he says here he's never told you why he did these things. You're talking about premeditation and deliberation. And then you admit, and so does everybody, and it's as clear as a nose on your face,  He says, you know, Mr. Hovey, Mr. Hovey told Lee and he told Hughes that he used a knife. He's never told you anything different. There's nothing different. You heard about a shock absorber. There's nothing different. You heard about a shock absorber. What about a shock absorber? You know, that's a red herring. That's something that's just smoke that's dragged across in front of you like a screen. Could it have been a shock absorber? He knows what it was, and if it was a shock absorber, don't you think he would have seen it? You would have seen it here? If it was a shock absorber, so what, so what? The credibility of these witnesses, and this is going to premeditation and deliberation. So it seems to me he's conjuring up these witnesses and he's saying his silence proves the credibility of these two jailhouse snitches on the knife. I don't believe so. I think, notwithstanding the fact that there may be griffinary, certainly the district court believed that there wasn't found, so the record does not reflect, does not support that. The California Supreme Court, didn't it? I understand, but the district court, in issuing her order, looked at this from the perspective that you're discussing. The California Supreme Court is very swayed by the knives. It was swayed by the knives, but the fact that whether he was killed by, whether she was killed by a shock absorber or by a knife, I believe does not indicate in any way that a reasonable jury would have come back with something lower than a first-degree murder conviction. This is not a second-degree murder case, Your Honor. You say that because of the nature of the killing. Because of the nature of the killing, because of the circumstances that the defendant concedes caused him to kill this child. Well, you know, the prosecutor tells the jury in closing argument that these informants are no good, but then he's telling them they're credible because this guy didn't take the stand and deny what they said. Well, I think there's more there, too, Your Honor. Let me ask you something else here. You say that somehow this is all mitigated by the court instructing the jury that statements of attorneys are not evidence. I don't see how that works. I mean, because the commenting on a person's silence, that's always a statement. I've never seen anybody before say you can get around Griffin error by telling the jury that the prosecutor's information is not evidence. Of course it's not evidence. I mean, that's what Griffin is all about. Your Honor, you're right. But the point is the Griffin error, to the extent that there was, one has to be measured and looked at and engaged in the context in which it was delivered and the context of the evidence as a whole. And every court that's looked at it to date has found no indication, no evidence, or no basis for supporting an inference of prejudice. Yeah, we have a de novo review on that, though. I understand, Your Honor. It doesn't mean we ignore what other people have said. I understand. You're right about that, too. It is a de novo review. But the factual findings are given. The factual findings by the district court is clear error. But there was no factual evidence here. Well, that was the factual findings. No, in this particular instance, we don't have it. We do have many findings of fact by the district court. Right, but this does not rest on that. This one does not. There's no evidentiary hearing on this. Let's go to my next question, then. If we assume for the sake of discussion at this point that it is Griffin error, why is it harmless? Does it have to be harmless beyond a reasonable doubt? Harmless beyond a reasonable doubt? No, it's the Brecht error. Brecht is the standard for review. Okay, no substantial and injurious effect on the jury. It's kind of two levels. Isn't there first a reasonable? I'm not sure. Go ahead. Well, we're in direct review of the district court's opinion order, but in reviewing any error in the state court, federal habeas court. Some of the cases talk about reasonable probability of effect on the verdict or something, and they all match the same thing, so go ahead. Sometimes we're talking about ineffective assistance of counsel. Sometimes we're talking about Brady error. No, I'm talking about Griffin error. Go ahead. Brecht and McNeil, if you get into Ethel points. Yes. Okay. Now, why doesn't it live up to that standard? Because of the circumstances of the crime. Because of the fact that the claim is that whether it was done by a shock absorber or by a knife makes no difference. The child was killed because she could identify who it was who abducted her. That isn't effective. No reasonable jury would find that effective. You're retrospectively saying it makes no difference, but it seems to have made a very big difference in this trial because they spent a lot of time trying to prove it was a knife. They tried to prove it was a knife, but again, we look at the evidence as a whole in retrospect because you are a reviewing court. Right. The evidence shows that the jury... But we're not trying to reconstruct whether you could have found the same result. We're trying to see whether it could possibly have affected the jury to the effect, to the degree that our confidence in the results has been undermined. Okay. Did it have a substantial effect on the... On the actual jury given the actual trial. And the answer is I look at the evidence myself, as you must as a court of review, and I look at the circumstances of the crime, and I look at the defense that was presented, and under no circumstance could any jury have returned a verdict of second-degree murder in this case. This case involves the admitted killing of a child after abducting her and killing her, according to the defense, in a panic so she doesn't identify him. What conceivable way can you argue that that is not... If that's... That's not... Medication deliberation. And certainly what conceivable jury could reasonably conclude that that is anything less than first-degree murder? Was child molesting felony murder, first-degree felony murder used as a theory in this case? It was not a felony murder charge in this case. It does... In 1978, when the charge was filed... Charges were filed in this case, it was unclear under state law whether you could charge a lewd and lascivious act in connection with a murder as a special circumstance. That was determined to be not available for purpose of the special circumstance charges in 1984 by the California Supreme Court. But in 1978, when this was charged, there was no law, at least it was unclear law in California about whether you could charge a lewd and lascivious act in connection with a murder as a special circumstance. Okay. It could not be charged as a felony murder because the only evidence they had was his confession that he had molested the child. And you have to have a corpus before you... Corpus delicti under state law. Under federal law, you could charge it. Right, can't under state law. Right. And so the defense attorney, he wanted a felony murder charge because a felony murder charge would allow the jury to avoid having to reach the deliberate premeditation element and then wind up with a special circumstance requiring a penalty. And at the penalty, the jury would hear about the second little girl that's pulled from the street and molested. And so the defense was essentially get a first-degree murder because no reasonable jury will come back with less than a first-degree murder, but get a first-degree murder that allows the case to end right there and then without having to go to a penalty phase. And so for the first time in my life, I've never heard of this, a prosecutor objected to the defendant's motion to have the jury instructed on a felony murder. I don't know, maybe perhaps as a court you see other instances where prosecutors object to defense requests for felony murder. I've never shot in 17 years as a state prosecutor. I'll tell you that right now. It's kind of hard to imagine. But the prosecutor knew exactly what it was that the defense attorney was doing. He knew he was giving the jury an opportunity to return a first-degree murder verdict, which it will do, without having to also find premeditation, deliberation, and a special circumstance that would require that penalty phase with all of the things that you read now. Trying to block off the penalty phase. Exactly. Block off that second objection. He wasn't trying to block it off when he was trying to make it go better. That's something I was quite confused about. He wasn't trying to block it off necessarily, right? He was trying to do two things. He was trying to give the jury an opportunity, as the defense attorney did in another 9th Circuit case recently, I believe it was Anderson. He was trying to tell the jury, bring back a first-degree murder verdict. But don't do the felony murder. Don't do the felony because that will require a special circumstance and a further proceeding. What he wanted was the jury to just come back with first-degree murder. And he also wanted to maintain his credibility because he expected that the jury would probably find a special circumstance. But if the lewd and lascivious had stayed in there the way he found the special circumstance, then that wouldn't have precluded the penalty phase, but it would have gotten to the penalty phase without a finding of premeditated murder. That's what I understood him to be saying. In other words, he wanted to be able to go into the penalty phase and then argue to the jury that this was not a premeditated murder and, therefore, that was a mitigating circumstance. It wasn't an intentional, deliberate, cold-blooded murder. And that had to be what he was saying because he did not expect the – he said that he objected to the lewd and lascivious on the special circumstance as a matter of pro forma and didn't expect it to get granted. Well, he moved to dismiss it after his request for a felony murder instruction was denied. At that point, he figured he'd build an error because he expected the prosecutor to object and he expected the trial court to – That was after the felony murder request was denied? I'm sorry? That was after the felony murder request was denied or was it before? I thought it was before. I'm not sure. I'm uncertain. Anyway, I don't know whether this all matters, but I spent a lot of time trying to figure out exactly what his theory was. The point is that he knew the jury. He expected the jury, and I think it was reasonable to expect the jury to come back with a first-degree murder verdict. He expected, therefore, that the jury was going to do something that was going to result in a first-degree murder. But if he could get the jury to come back with a first-degree murder, that would end the trial right there and then that would be great. And if it didn't, at least he would maintain his credibility with the jury. So he was already informed that this was essentially a sexual molestation case? You like the Gentry case. The Gentry case? Yes. And that case says a lot about how a lawyer – and also the Anderson case – how a lawyer who has a very bad case in front of him has to go to a jury and maintain some degree of credibility. Would you like to say anything to us about the jailhouse informants? The jailhouse informants. This is what they testified to. Lee. He wanted protection from the badge. That's why he was testified. He testified that he was convicted of voluntary manslaughter. He testified that he had recently pled guilty to escape charges. He testified that he had been in a mental hospital for a year. He testified that he had hopes of getting protection from the badge after testifying. Okay? That's what he testified to. That's what the jury heard. S.E. Hughes. Hughes testified that he had a criminal record. He had pending burglary charges. And that he, quote, had hopes, end quote, of not going to prison on those charges after testifying. I'm not quite sure what the difference between hopes that he testifies to about not going to trial and promises that he says he didn't get. In fact, the trial district court, finding the facts, found that there was no promises as to the Alameda charges. And any promises were, at most, implicit as to the San Francisco pending charges. And the jury heard what it needed to hear about the credibility of these witnesses. In fact, the prosecutor, as I think you noted earlier, got up afterwards and during the closing argument, referred to the informants as none of them are any good. They recognized that. Because I made that argument a hundred times. But the way I look at this record is, even if you had hauled in everybody who knew anything about what was going on, district attorneys, local district attorneys, their testimony would have been, we haven't promised these people anything. Most, we've given them an opportunity to help themselves. Exactly. And no reasonable jury would expect or understand anything less. Again, the district court made findings that there were no promises, at least as to Alameda, and no express promises as to the San Francisco pending charges. And there's never been anything come forward in this case suggesting that a prosecutor said, you help us and we will not prosecute you. There's nothing like that in the case as far as I can tell. There is nothing that I'm aware of. You know, of course, the difficulty here is the track record of jailhouse snitches everywhere, including California, hasn't been so high. Well, again, let me fall back. One of the glories of defending a district court judge is that you've got findings of fact that you can rely on. And the judge in this particular case read the depositions of both Lee and you that were given on behalf of Hovey after the judgment in this case became final. Why did you say he was coming forward? I don't remember. As I recall, he stated that no express promises were made to him, as I recall. Didn't Lee say that somehow as a moral matter or emotionally he just had to unburden himself from all of this stuff? Well, I believe that he said that in the – I believe Hughes said that as well. That has a deafening ring of untruth. That is a subject when you also get the witness to testify that he had hopes of not going to prison on those charges after testifying that pending criminal charges that he's a lifelong criminal or a long criminal record or has a criminal record. I don't know how long the record was. I think the jury knows. I think the jury also heard the prosecutor talk about these people not being good people. I forgot to say before I didn't finish this. One difference, though, in this case – and this is going back to the Griffin era, but it's related – was that there – I guess it's not the Griffin era. There was no instruction here, as there often is, with regard to the jury just believing or not – or being cautious about believing the informers, right? It wasn't asked for. It wasn't given. Is that right? I don't believe there was a cautionary instruction. I don't know – I can't say yes or no, but I don't remember there being one. And obviously I'd have to look at the records. That really wasn't standard in the late 70s and early 80s. I don't remember those. Things have changed over the years, Your Honor. But at that time, again, when we go back to the Griffin era, I understand – And there wasn't a cautionary instruction with regard to the Griffin era either. I don't remember any, Your Honor. Again, I'd have to look at the record, but I cannot say that there was. The Griffin era, again, according to the district judge who reviewed the record very carefully, was that it was very limited in its import, very short and small in light of the size of the closing argument. And in the context, it just did not have a substantial and injurious effect on the verdict in this case in light of the overall circumstances of overall evidence. How about the whole issue regarding Hovey's absence at the hearings on Trudell's competency initiated by the Superior Court judge? Well – Does the state agree that that was a presence? The state does not agree. Does the judge violate Hovey's right to be present at that proceeding? No, we don't agree. In fact, we'll rely on Ninth Circuit precedent, the United States versus Wheat. So let me just get this. If it's just an in-camera hearing initiated by a trial judge to discuss the ability of counsel to perform competently, it is not a critical stage under any established law in 1987 and 1988. And I know that – Can you characterize this as just a little hearing? Well – She ordered witnesses and pulled in. This is just a big hearing. It is a hearing. It took testimony, essentially. It took people's testimony. It still doesn't become a statutory. I've never seen anything like this. I've never heard of anything. I was in the trial court justice for 18 years. I've never heard of this kind of a proceeding. Well, it's not common. It's not common. I do know – That's good news. I do know of one in 1987 that happened in the federal district court in the Ninth Circuit in which, again, it was the United States versus Wheat, which was affirmed by the United States Supreme Court on a different issue. This case was affirmed, and one of the issues was the defendant's absence during the judge's conference with counsel. Back up a little bit and give us the whole facts on the Wheat case. In the Wheat case, the judge had an in-camera hearing with the defense attorney because of a concern that the defense attorney, I believe, had some drug and or alcohol problems. And so there was a hearing at which the defendant was not present and about which the defendant apparently was not informed. And the judge was satisfied and left the – Did he just have sort of a little conversation with the lawyer? It was a hearing under Rule 43. Did he put people under oath? I don't believe so. The Wheat argued – let's see. I have it in front of the presence report. It was a hearing. It was an in-camera hearing. Three months before trial, the judge conducted an ex parte in-chambers conference with Wheat's attorney regarding the attorney's past narcotics and alcohol abuse. Okay. That's a conference. It doesn't say hearing. I'm not sure there's much of a difference. Well, do you ever have people put under oath and they were examined and they were talking about representing each other and they were contempt findings? That makes a difference. That's certainly important if there's a confrontation issue here. But this is not a confrontation issue. Well, it says something about the character of the proceeding, however. It says something about the character of the proceeding, but first of all, this is not a Sixth Amendment issue because there's no confrontation-clogged problem here. There was no charges, no evidence, no witnesses that testified or evidence that was presented against the defendant. So what's the exact holding in Wheat? In Wheat? So long as it's a conference to discuss competence of counsel, no matter what happens, I'll read it to you. there will never be a violation of the right to presence rule. I'll read it to you. The presence requirement of Rule 43 is broader than the Sixth Amendment rights to confrontation and the Fifth Amendment due process rights. Citation. Due process does not assure the privilege of presence when presence would be useless. Citation. A violation of Rule 43 does not require reversal unless a reasonable possibility of prejudice is shown. If the presence is being useful or useless, here the question was how he was being represented. So it wasn't something that happened months before that the defendant would know nothing about. That is, whether his counsel had a drug problem. This is something he would certainly know about, which is how he was being represented. Your Honor, it's a variation on the same thing. There's a hearing. But to the utility of the presence of the defendant, the defendant's not going to have anything useful to say or contribute, presumably, about his counsel's drug or alcohol problems, but he's certainly going to have something useful to contribute about how he's being represented. Well, the defendant can always move to substitute his counsel, can always express discontent with his counsel before the judge. That's a different question, though. The question is, we were honing in on a standard here, which is whether he would have anything useful to contribute through his presence. And as to that question, why isn't this quite different? Well, because there is no substance of the difference, because the defendant said if he'd been there, he would have substituted his attorney. As to the back-and-forth discussion, he wouldn't have anything actually useful to contribute, but here he certainly could have. How could he have? He can do so right now. He can make it, or he does so right now with respect to the possible effective assistance of counsel claim. In what way would this? That doesn't seem like a useful way to run a court system. Well, it may not be. It may not be, but that doesn't mean this was structural error requiring a reversal. The question to start with was whether or not this was presence error, whether this was under existing law. Now, the country court found, determined as a matter of law, which we review day and night, that it was a violation of his right to be present. Now, you don't want to stand on that. You want to back away from that. Of course. Right. Things you like, you're willing to. Unlike any other lawyer, things I like, I will advance, and things I don't, I will oppose. Let's assume for a moment that it's a presence error. Let's assume that. Let's assume for a moment that it's a presence error. Just for a moment, again, the law under United v. Wheat is the law that, you know, we have a Teague issue. What do you do with Wheat and Campbell, then? Campbell seems to say otherwise, no? No. Campbell, if it's a hearing on a conflict of interest that affects the fairness of the trial, it's a critical stage in the proceeding, and it's structural. That's what Campbell comes down to saying, and, of course, we object to that. It's structural for the reason that a conflict affects the conduct of the whole trial from beginning to end, or affects the framework within which the trial proceeds. This isn't the same thing. That has to do with whether it's structural error. It doesn't have to do with we're back in the same place again. Before Campbell got to that question, it first held there was presence error, and how is that reconcilable with your representation about Wheat? Well, the presence error requires the critical stage. There's no presence error unless there's a critical stage in the proceeding that you're not presenting. So we go back, perhaps, in a circle. Under existing law in 1987-88, under United v. Wheat, there was no critical stage with respect to the issue that we had here. Is your understanding of the Sixth Amendment critical stage and the presence critical stage the same? No, they're different. If you read Campbell, they don't get into the Sixth Amendment. They're dealing with a due process presence. I mean, critical stage concepts are different, too, so something could be a critical stage for presence purposes and not for Sixth Amendment purposes. Right. Under the Sixth Amendment, there are two issues there. First, if the attorney isn't present, you've got a reversal if it's a critical stage. And that's, I believe, Cone v. Bell v. Fuller, I'm sorry, a stage that holds significant consequences if the attorney is not present. If you're denied the presence of counsel under the Sixth Amendment, you get your reversal. Also, under the Sixth Amendment, there's a confrontation clause that requires presence at a critical stage in the proceeding. And the critical stage of a proceeding is when there's an adversarial process in effect, when there's evidence or witnesses brought against you. That's not the case here. That wasn't the case in Campbell, either. That's why they didn't talk about the Sixth Amendment in Campbell. Why keep Hovey out? Why? They bring Hovey in for the same reason that they brought Wheat into that conference. You'd get a problem. You'd get tension and you'd get difficulty in the relationship between the client and his attorney. You mean it couldn't be worked out? It doesn't mean. And perhaps, in light of all the problems that we've confronted since then, it might have been a better idea to keep him. 1987, 1988. It's cooler for the judge to suggest to Hovey's supervisors, I mean to Fidel's supervisors in the public defender's office, go back and contact Hovey. Find out if you've had any discussions. Why? It's all very bizarre. Judge, if I could do it again, I'd do it differently. But the point is, back in 1987, 88, this was not established law. Campbell was not established law, and there was no law, constitutional law, that made this kind of proceeding a critical stage. Second. So you have Heath versus Lane, new rule, rule. Right. And I'm going to be relying on the great jurisprudence of Knightley versus Wheat on that issue. As for Campbell, Campbell, again, involves a hearing on a conflict. What we have here is not a hearing on a conflict. We may have a conflict at a hearing. Do you think this hearing ever evolved into a conflict situation? It may have. But then we have a conflict at a hearing. But we don't have a hearing on a conflict. And there's a difference. Say that again. A hearing on a conflict involves a structural problem, a structural issue. So when this hearing evolved into a potential conflict. Right. But if it evolved into a conflict, then the conflict involved the hearing, not the trial from beginning to end. The structural problem, the structural defect, that requires reversal, involves the defect of the proceeding in the trial, in the trial, from the beginning to the end. And here we have, at most, a defect or a conflict in the hearing, not in the trial. All right. So let's assume for the moment that there was presence error and get to the structural versus trial error. I must say that I really don't understand with the trial judge what Judge Patel did with that. I don't understand how you can answer the question whether something is structural error by seeing whether there was prejudice. Because then you're requiring that there be prejudice and you're precluding structural error. Yeah, it's the eternal circle. But the thing is, under the Due Process Clause, it's either trial error or structural error. You've got to make a choice. You and I argue that you would agree that she was wrong, but you would say that she was wrong in her methodology because you would say this is trial error no matter what. This is trial error. And the reason it's trial error is because it's only structural error if it's a defect that compromises the proceedings of the trial itself from the beginning to the end. But the problem is that presence error often does, right? Pardon? Often presence error is treated as structural error, is it not? Yeah. I don't know how often. I'm not sure. Under some circumstances. Under some circumstances. All right. So what she was trying to do was discover what the line was, one of the circumstances in which presence error is structural error and one of the circumstances in which it's trial error. So can you help us with that? Okay. Trial error is error that, well, structural error is error that infects the fairness of the proceedings of the trial, the charges it brought, the trial itself, the opportunity to defend from beginning to end. That's why it's a structural error. Well, we've had situations, I believe, in which there's been presence error, for example, in read-back circumstances if the lawyer wasn't there. I remember one case where neither the lawyer nor the client was there. And we said that was presence error. The trial's reversed. I mean, it's gone. Well, the absence of an attorney. We're getting to the Sixth Amendment. Well, but this was, I believe it was presence error. Well, you know, sometimes the word presence error means a lot of things because we're dealing with- In other words, presence error is always going to be at some point in time. And you don't have to be absent from the whole trial for it to be structural error, do you? No. All right. So you have to be absent at some- At a critical stage. At a critical stage, right? And then it can be structural error. Correct. So what's the line? If this is a critical stage, why isn't it structural error? Reversal is automatic if the defendant's absence constitutes a structural error. That is, an error that permeates the entire conduct of the trial from beginning to end or affects the framework within which the trial proceeds. And I'm quoting from Campbell versus Russell. That's the answer to your question. It doesn't answer much for me. Well, you have to contaminate the entire trial from beginning to end. Do you think that once the judge essentially accused Trudell of being unprepared and incompetent- Is that incompetence? Yes. Do you think that that had any effect on Trudell's-you know, the way he approached the trial? Maybe it made him work harder. Is that what you're saying? Well, I mean, he later, when he asked to dismiss the student of Sivius charges, he said, you know, I did it because I didn't want to keep it from being ineffective. He also said, I wanted to build an error. And he said there was no benefit to him keeping it. I don't know the answer to your question, Judge, because you're asking something I have absolutely no ability to- I keep hearing your question in my own head, and I don't know whether it makes any sense, but does it make any difference in this case that this was an appointed attorney as compared to a retained lawyer? I don't know of any difference, Your Honor. I'm aware of no case, body of law, that would suggest there was a difference. But, again, I'm sure Ms. Turner may have- The reason it wouldn't matter, I suppose, is because he's somewhat dependent on her goodwill in the long run, or in the goodwill of the trial judges to get appointed. I guess he wasn't until he was the PD, so he was the PD. He's likely to be a public lawyer. I get paid at the end of the month whether I do a good job or a bad job. Having been appointed by the court, does that put the judge in a different position regarding that lawyer than hope he retained his own lawyer? The attorney was the employee of the Alameda County Public Defender's Office. And, as I said, I don't know of any relationship or any- I guess what I only do is pay the public defender's appointedness. Can we just go back to the structural error thing again? You're uttering some words, but as a practical matter, how could we decide whether somebody was absent for two hours during the trial, whether that's structural error or isn't structural error? I don't understand the standards you're asking us to apply. I'm only- I'm citing from- Well, I understand, but then we have- Again, the structural error always implicates the trial from the beginning to the end. It's not- It's something that is so basic to the- Well, if he was, in fact, incompetent, that would implicate the trial from the beginning to the end. Well, if he was incompetent, meaning that if he was deficient and his deficiency prejudiced- Well, not necessarily. It depends what you mean by implicate. Implicate means effect. And if you build prejudice, then, to the standard of whether or not there was structural error, you've eliminated the structural error concept. No, you're right. Because it's structural, you can't gauge the prejudice. That's the problem. That's why it's reversible, because it contaminates the proceedings from beginning to end in such a way that it just deprives the defendant of a fair trial. When you have an ineffective assistance of counsel claim, the attorney may do all sorts of ineffective, deficient things, but it may have no effect whatever on the result. Substantial or probable effect on the jury. So you're essentially saying that because this was a hearing on ineffectiveness and because the ineffectiveness could be gauged separately during the trial and was not a critical- You're sort of wrapping back to it either wasn't a critical stage or it was trial error because you could look at the actual trial to see what happened. Exactly. You know, it wasn't a critical stage because, under Teague, in that great case, the United States v. Wheaton, it was a critical stage, Your Honor. It was not structural error because of the nature of the error, because of the nature of the present error that was at issue. We don't have a conflict which contaminates- And you don't think it evolved into a conflict situation? It has never been an allegation of a conflict with respect to his- To what happened at the hearing? To what happened at the hearing. I don't know of any. I'm not sure. The attorney may come up and identify something like that. I don't know of any. There are other claims of ineffective assistance of counsel. Mr. Trudell claimed he was representing Mr., who was it? He isn't Lee. No, Mr. Trudell was at the hearing. One of the lawyers asked for a lawyer, and Trudell said, no, I'm representing his co-counsel. I can't remember the co-counsel's name was. Harpeth. Harpeth, yes. Well, I- Is it just a bizarre case? It was certainly a very unusual proceeding. Well-intentioned, but nonetheless bizarre. Again, the question that is, you know, whether it's structural error, and the district court said no, and I believe there's no law that, or any kind of analysis that would justify reversing that decision. If you have anything else you'd like to tell us. Only if you have a question about any specific issue that you find disturbing with respect to the district court's order. Jump over to the penalty thing. Okay. And mitigation. There I think we have, first of all, I have a lot of objections to the characterization of Dr. Satton's testimony and the circumstances in which, or the circumstances of that whole mitigation case, and the questions asked of him by the prosecution, and what wasn't said, and what was said. But be that as it may, the court has a record it can review. And the district judge, in great detail, summarized what happened. One thing that was obvious to everybody, that is that, and let me back off a moment before I tell you what was obvious. The district court made numerous findings of fact, numerous findings of fact about the effect and credibility of any difference or any changes that would have occurred that had the attorney, defense attorney, prepared Dr. Satton any differently or any better. And the judge made all, numerous ones. And, in fact, one of the most best summarized statements of all, the factual findings made by the district court is made or summarized by appellant in his brief. And I would suggest you look at it because it's accurate. On page 76. 76 of the blue brief. Blue brief. The court stated that had Trudell performed adequately, Dr. Satton's credibility would have improved only marginally and asserted that the evidence that Trudell failed to present would have undermined Satton's diagnosis. What they're talking about is the Choke Hospital records and the Fairmont Hospital records. One of the most bizarre arguments I think you can make is that the opinion, the diagnosis by Dr. Satton would have been helped by diagnoses that are inconsistent with his diagnoses that were made by doctors before the murder and abduction and after the murder and abduction. Maybe the death was that. As a prosecutor, I would have thanked God if those medical records and psychiatric records had been an issue at the trial. There are two things about that. One is the piece that probably disturbed me the most was the fact that he said that there was no record of any medication which wasn't Satton. That was unclear. I think it was unclear. It was unclear about it. He was prescribed Haldol, which is a medication one prescribes for schizophrenia. It wasn't prescribed for schizophrenia. It was prescribed for something else. But it is prescribed for schizophrenia, and there was some, at least they were at least considering that he might have schizophrenia, and he did get the medication. And the statement by the prosecutor at the end of the trial was quite global. He just never had any medication for a mental problem, and that's not true. Well, that may have not been true, but it would have been even better for the prosecutor to cross-examine Dr. Satton about the medication that was prescribed not for schizophrenia, for a diagnosis that were inconsistent with Dr. Satton's diagnosis of schizophrenia. The doctors, the impartial doctors that weren't testifying for anybody, before the murder, after the murder, all of them, every single one of them came up with diagnoses that were inconsistent with Dr. Satton's. Is that what a defense would want a prosecutor to be able to do, to cross-examine and impeach the expert as to his basic diagnoses in light of medication, in light of diagnoses that were made by impartial treatment-oriented physicians? Judge Patel saw this, and again, she made findings of fact, and one of the most obvious ones are summarized by Counsel for Sokovia. The district court's findings false at appellant for having failed to identify specifically how providing Dr. Satton with various records would have assisted the psychiatric presentation and prevented credibility impairing cross-examination. For not having shown how Dr. Satton's testimony would have changed, much less benefited had he known all the facts. For not having Satton explained how his testimony would have been different. For not having presented evidence about how Satton would have incorporated the true facts into his testimony. For not having shown that Satton's testimony would have been stronger. For not having Satton state that his trial testimony would have been different had he known key facts. For not having shown how Dr. Satton's testimony would have changed had he known key facts in advance or he would have counteracted what the court said were their damaging effects. And for not having shown that the substance and tone of the mitigation case would have been different. All these are factual findings. There was nothing in this evidentiary hearing that enhanced the credibility that Dr. Satton did not have at the penalty phase. If anything, it could have gone the other way, although the result would have been the same. These are factual findings by the district court listening to Dr. Satton. And in listening to Dr. Satton. What about the fact that apparently Dr. Satton was not given much information about the circumstances of the Albany kidnapping and therefore testified inconsistently with the actual facts. Yes, he also testified that it didn't make that much of a difference in terms of his diagnosis. And he also testified at the evidentiary hearing that, well he didn't testify, anything that could have benefited him at the evidentiary hearing if he had known about it. If I had a psychiatrist say that once, I heard it a thousand times. Doctor, did you know he had a gun? No. Would that change your diagnosis? No. Does that make any difference? What would you do? How would you better testify? There was no answer. There was no evidence presented that it would have improved his ability to respond or that he would have been able to give the jury any better response that he gave or make his credibility with respect to his opinion any better. And I would also indicate to you that the court also found that Dr. Satton was a competent and credible witness who handled cross-examination well. Dr. Satton didn't have answers for how he could have improved his testimony, how he could have been more persuasive, how Tohovi could have benefited from him. These are all factual findings with respect to the import. Are there any changes or any differences in how Satton would have been prepared or how he would have testified? I have one last question for you. It concerns me. You recall that when Dr. Satton was testifying and towards the end of his testimony, Trudell asked him if he had an opinion as to whether or not Tohovi was mentally impaired, I forget the exact question. The prosecutor stood up and said, you mean now? And Trudell said yes, and then there was an objection as irrelevant. Right. And there were further proceedings along that same line. Right. Well, further proceedings, you mean what? Well, he tried to ask that question again. And the objection was answered. Right. And it wasn't answered. Right. But he wasn't allowed to express an opinion as to whether Tohovi was suffering from a mental impairment at that time. Right. But you'll recall. My question was this. Do you think that the jury fully understood that they could understand, that they could consider in determining whether or not Tohovi should live or die for this crime, that they could fully consider his present mental state? Yes, sir. How? Explain to me how. The jury was never told in any instruction they couldn't consider his current mental state. Second, during almost all of Dr. Satton's testimony, his discussion of Tohovi's condition was in the present tense. But when the question was asked, it was an objection. It wasn't relevant. I know. But the jury was never instructed, and there was never any argument in the penalty phase by the prosecution or anybody, that they could not consider his current mental condition in respect to mitigation. They didn't have a current mental condition because it wasn't ever answered. Well, it wasn't answered because he testified continually about Tohovi's mental condition. The critical question that was answered in the end was his mental state at the time of the killing. Right. Well, there's no question that – I'm sorry. His mental state at the time of the killing. Right. Well, that was the thrust of the defense. That was the heart and soul of the defense. But it seemed like Trudell wanted to go further. If he did, he'd make no further – Well, you recall that they went into chambers to discuss the issue, and there was a discussion about what factor – was it J at the time? J. J? It became K, both J and Logan. Right. And there was a discussion about what that factor was intended for, why it was included in the legislation, in the bill. And they never really seemed to resolve it, But it seemed as though Tohovi was trying to argue – or not Tohovi, Trudell wanted to use his mental state to fully make it clear that the jury could consider his then mental state, mental condition, assessing whether or not he should live or die. There was no inhibition, no limitation on the argument or the presentation of evidence. Do you think factor G at the time was sufficient? Factor G or J? Or K. J, I'm sorry. I believe it was. It's no different, basically, from K, and there's certainly no law anywhere that suggests otherwise. And I believe the entire mitigation case concerned his personality, which is K. There weren't the, I don't know, 17 witnesses, the friends, the family members. Their testimony was not about what his mental state was at the moment he murdered this child. It was about what he was, what he was and what he is. There was no implicit suggestion that the jury could disregard who he is when it reached its verdict. Nor was there any suggestion by anybody that it couldn't. Nor was there any suggestion that that was even an issue before the jury. But then why was his current mental state irrelevant? Why was it irrelevant, what his current mental state says? Because the, I believe the expert was talking about his condition at the time of the murder, what it was like. But then when he was asked to talk about his current condition, it was said to be irrelevant. I understand. But the purpose of the current question about the current medical condition was not because they wanted to present mitigating evidence about what a wonderful or what a sick or what a troubled person he was then and there. It was because of the nature of the questioning as to what was the relevance of the question, what was the relevance of his mental state at the time of trial as opposed to his mental state at the time that the expert was testifying with regard to his opinion as to his mental state. I think that's what it was. And if it wasn't, it certainly wasn't so, such an error as to in any way affect, with any reasonable probability, with any substantial, a jury can have any substantial injury effect on a jury's decision about whether to vote for life or death. It was a passing, it was in light of the record as a whole a trivial issue. At least I think the record reflects that. Anything else? Thank you, counsel. Thank you. There's a couple of things on the factor K or J or whatever it was. That's the same instruction that was repudiated by the California Supreme Court and easily and then replaced by the California legislature, the same instruction that was given in Peyton, the same instruction given in Bill Murphy. And here we have the ‑‑ I'm aware. Sorry? I'm aware. I'm conscious of that, Your Honor. And here you have the prosecutor arguing that his mental illness can be considered aggravating, not mitigating. That's the reporter's transcript at pages 1261 and 63. As Judge Renon said earlier, you know, I looked hard to see if there was any hint of what Trudell was trying to show with his mental, you know, his mental capacity, that holy mental capacity at the time of the trial. That, you know, with medication or something that, you know, he could be treated and you add that with his conduct in prison or in jail during the pendency of the trial, you know, that was an indication that Hobey, you know, Hobey had something to contribute to society even if it was in, you know, a prison sentence. Well, I agree, but it's hard to figure out. It looks like, I mean, it looks like Trudell had that in mind because if you follow that little colloquy that took place in Chambers, he's talking about what Factor J at the time was intended for. Right. But at the hearing that was held 20 years later, we still have nothing about even what did happen in the 20 years, or so there's kind of a hole there in terms of what the prejudice of not allowing him to go forward with the mental health evidence was. Besides this other question, which I asked you before, which is why does it fit into the other factor anyway? Yeah, the hole would have been plugged in the hearing. The hole would have been plugged at the hearing below if Judge Patel had not excluded our psychiatric expert who would have made it real clear that Hobey was seriously mentally ill before the crime, at the time of the crime, and for years thereafter. But that isn't really what we're asking. We're asking, okay, now what's the next sentence about why this is a mitigating circumstance? Why that's a mitigating circumstance? And what would he have said? In other words, there was nothing to suggest what would have been made of that in terms of arguing that it's a mitigating circumstance. That's different from the fact that he had this problem at the time of the crime. Well, that this wasn't episodic, that this wasn't an excuse invented to get some hired gun in there to tell the jury that, well, he was temporarily insane. So you're really saying it would have been used to prove up the origin, that he was, in fact, mentally ill at the time of the crime. But also the fact that one is mentally impaired is a reason why death might not be appropriate, and at least one juror might think that. The same reasoning that applies to mental retardation. A mentally ill person isn't as fully culpable as somebody who is perfectly fine. Judge Paez asked about whether there was any conflict issue at the hearing, and there was. Judge Patel found, and I'm looking at page 13 of our brief, that Trudell's interest in being found competent conflicted with Hobie's interest in an accurate determination of whether Trudell was competent. And then further, Trudell appears to have been representing his own interests and not appellants, so there was conflict to that extent. And then finally on the Griffin issue, the reason that Judge Patel found that Griffin was not by itself, the error was not prejudicial, was because she said there was sufficient evidence of premeditation other than what came from the two jailhouse snitches. But there wasn't. The evidence that he picked up the girl and then he blindfolded her and then he drove her away and so on was certainly evidence that he premeditated the kidnapping, but not the killing. And I would direct the court to Judge Patel's finding that's in the excerpt of record 268 at page 11, that before they got the jailhouse snitches' statements, the authorities did not yet have enough evidence to charge him with that crime. Then there was a question about the instructions with regard to Griffin. Of course there was the standard instruction that arguments of counsel are not evidence, but if that were to excuse Griffin error, there could never be Griffin error because it would just swallow it. Was there an instruction that a defendant doesn't have to testify, that that's the defendant's choice, and it shall not be held against him? Well, I wish there had been. I don't think there was a – I don't think the judge clued the jury into the fact that the defendant was not required to testify that he had a Fifth Amendment. That's pretty standard in Los Angeles County, but I don't know. That's what I thought. I don't think there was such an instruction. That's what I thought. We were told, Mr. Vietas, that there was one. There was no instruction that the jury should view with caution the testimony of the jailhouse snitches. Was there one asked for? There was not. We raised that as an issue in the California Supreme Court, and they decided that there was no sua sponte obligation to make. But just so that it's clear, there was no such instruction. There was not one of those in Talgic at the time either. That's right. I think there maybe is now. Well, the law has completely changed after the Leslie Vernon White fiasco. Right. And then the last thing was that there was no admonition after the Griffin violation. There was no curative admonitions at all, which this Court has said makes a difference. Did the trial court rule that it was a Griffin violation, the trial court? I'm sorry? Did the trial court see it as a Griffin violation? No, she rejected it. That was raised. It was an objection. Well, he did object and asked if the prosecutor could be cited for misconduct, and the judge said no way. That is what he did. And she did not give the curative admonition that this Court has thought is very important in other cases. That's all I have. I have one question. We've heard about WEAP. We're being told that WEAP was the rule, and to do anything other than seeing WEAP as controlling in this case is, number one, wrong, and to change the WEAP rule afterwards would violate Teague v. Lane, the new rule of rule. Your response to WEAP? Well, WEAP was different. But on the Teague issue, the Attorney General cites the main cases on the right of presence. We cite them. Judge Patel cited them, and they all predate 1988, which is the cutoff date in this case for Teague purposes. They're all the right of presence was well established by the time the California Supreme Court decided this case in 1988. But the question really is whether, first of all, how do WEAP and Campbell, even at this juncture, enter to act? And second of all, given the fact that there seem to be two cases at least in some tension with each other, one of which preceded the cutoff date and the other one of which long after it, why isn't there a Teague problem? I don't know that the Court has to choose between WEAP and Campbell. Campbell's recent. Right. Right of WEAP. I don't know that they even cited WEAP. Well, what I'm saying is that if Campbell is seen as a refinement of WEAP, either an overruling of it or a refinement of it, whatever it is, it's new compared to WEAP. So the question is, why isn't WEAP the controlling precedent? Well, the right of presence, though, at a preceding case. Right, but we're not breaking it down a level or two levels. Right of presence in the. . . We're not breaking down too many levels. If it gets too specific, then Miranda. In a hearing regarding, in some sense or other, the competence attempts. I mean, these three were all in some sense or other about that. One was about conflicts, one was about performance, but they were in some sense or other about that. And so we have three cases. We have WEAP, we have Campbell, and we have this case. And we have the last. . . This case. This case. And the question is, what rule do we apply to it? Well, we certainly didn't need Campbell to get Judge Patel to decide that there was presence error. It's a matter of constitutional law. But you're also relying on Campbell for the structural error point. He, as I recall, was at a federal rules case. Yes. That's just the remedy. That's not the right. Well, you know, you get into this question, the right. If you express it at a level of generality that it's simply the right to a lawyer. Or so specifically, Mr. Gutierrez had a right to be a lawyer. I mean, you've got to find it in sort of in the middle in a way that gives fair notice to the state almost. You can't do this anymore. Exactly. Do you have anything else? Nothing. Thank you. I was wondering if the court might be helped by providing it with an instruction given to the jury in relation to the grip of the issue that the court has raised. Actually, I have it right here. It's page 712. And it wasn't. There was some sort of. It was, in deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the people to prove beyond a reasonable doubt every essential element of the charge against them. And no lack of testimony on the defendant's part will supply a failure of proof by the people so as to support a finding against them on any such element. That's it. It stopped right there. It didn't go on as the current instructions now do, saying you can't hold it against the defendant. I haven't seen those instructions in 50 years. Yeah, that was a pretty standard Calgic instruction. We thank both of you. It's much stronger today than it was then. We thank both of you for a case well-briefed, well-argued. We appreciate your giving us more time than we told you we would take. And we will get you a decision. But we can't promise it's going to be next week. We're going to recess until tomorrow morning. I'll be here.
judges: Trott, Paez, Berzon